Ferris Thorpe v. Darren Boykin and others. Mr. Boss, when you're ready, please proceed. In August 2019, Mr. Boykin complained about the inability to breathe and also stated that he felt like he was going to pass out. Then he lost consciousness. Despite defendant Weaver hearing and seeing this serious medical emergency unfold, she decided to do nothing until Mr. Boykin deteriorated into a state of loss of consciousness. She failed to do anything and instead did not take any reasonable measures to abate the serious risk of harm Mr. Boykin faced when he said that he felt like he was going to breathe. He felt like he did not have the ability to breathe and that he was going to pass out. In our first argument before this court, the court wanted to know what was the something that we were saying defendant Weaver should have done. With the face of the facts that confronted her, there were three viable options she could have taken that day that she did not. First, she could have provided basic medical aid herself during the transport when Mr. Boykin said that he felt like he was going to pass out. She could have done CPR, checked the pulse, checked his breathing, or she could have herself performed a sternum rub. Second, she could have summoned medical attention by calling 911 or EMS. Third, she could have brought Mr. Boykin directly to medical attention, such as going to the hospital that she passed on her way to the jail. Despite all of these viable options, defendant Weaver did nothing. The district court erred in two ways in this case. First, they improperly resolved genuine disputes of material fact that should have been left for a jury to decide. Second, they probably felt that the law was not clearly established, placing the defendants on notice that their actions violated Mr. Boykin's rights under the 14th amendment to the constitution. Because this was error, we request that this court reverse and remand so that the jury can decide these genuine disputes of material fact reasons in this case. Another issue before the court in oral arguments that appellant's counsel previously conducted in this case was if there was a failure to call 911 alone, if that amounted into a constitutional rights violation. This is because of the 2021 COPE case, which just explicitly tells officers that in order to summon medical assistance, they explicitly need to call 911 instead of relying on other individuals to do so. However, this is not to say that in 2019, officers could ignore a serious medical issue that they confronted. As early as 2001, the Thompson v. Upshaw case required officers to summon medical attention prior to a manifest or full-blown emergency development. That is what Officer Weaver failed to do in this case. But the clearly established law goes back even further than 2001 with Thompson v. Upshaw. There's cases such as Niren, Easter, and Williams that Judge Graves had an opportunity to hear in this court in 2022. In Niren, the officers were found to have been deliberately indifferent because they had subjective knowledge of a detainee's request for medical attention, yet turned a blind ear to his request. Easter v. Powell also had the same issues of officers hearing about a detainee requesting medical attention and turning a blind ear to his request. Easter v. Powell specifically said there were deliberate indifference when officers refused to treat, ignore complaints, intentionally treat incorrectly, or engage in any similar conduct that would show a wanton disregard for a prisoner's serious medical needs. Williams in 2022 discussed that Easter and Niren taught law enforcement that they may not ignore a detainee suffering from a serious medical emergency. But they have to know about it. They have to have subjective knowledge, right? Correct. In other words, we don't look in hindsight. We don't judge what the officers do based on what we know today. We base it on their perceptions at the time. With regard to officers Scott and Hobbs, what is the basis for their knowledge that he was having a medical emergency? So the basis of their knowledge, Defendant Hobbs was informed by Mr. Boykin himself that he could not breathe. And then Hobbs said, you could breathe long enough to get over here and run. That's at the record of appeal at 3272-3619, which is the video, the 16 minute and 19 to 6 minute and 58 minute mark. Then in response to Mr. Boykin pleading for help that he couldn't breathe, Scott was told that Mr. Boykin couldn't breathe, but Scott did nothing to provide medical care or did not tell his subordinates, Weaver and Hobbs, that they needed to provide medical care. So Hobbs himself was told by Mr. Boykin he couldn't breathe. But where's your case that says that's enough to substantiate the officer's subjective knowledge that instead of being winded from running half a mile, he was having a health emergency that required medical attention? It's based on the 2001 case in Thompson that says you have to summon medical attention before there's a manifest or full-blown emergency that happens. First, I will note after he stopped running and then he was placed in the back of the patrol vehicle, he's still saying that he can't breathe. Well, didn't Hobbs turn up the air conditioning in the car? I guess it was a hot day. Correct, but one, I would say that saying that turning up the air conditioner just makes you feel colder. That doesn't address that you're saying you can't breathe. If he was saying I was hot, maybe that would have been sufficient to address that situation. But that's not deliberate indifference. The officer didn't ignore what he said. He just, maybe he did the wrong thing by turning up the air, but he did that. He attempted to cool the car down. Right, so he did something. However, that didn't actually address the harm that was happening. Even though he turned the air on, Mr. Boykin was still saying I cannot breathe. Other than other than his protestations that he couldn't breathe, what is the evidence that Officer Hobbs knew that Mr. Boykin was having a serious medical emergency? The serious medical emergency is him saying that I cannot breathe. That is a serious medical emergency. Saying that you have the inability to breathe is something that could be potentially life-threatening. Saying that and then further on that condition is continuing to deteriorate. So this is not cases where we're saying the serious medical emergency is some underlying medical condition that was unknown or that is ambiguous or that could be a non-threatening underlying cause. Okay, is the same answer for Officer Scott? He didn't even really see or interact with Mr. Boykin, did he? No, he was only told secondhand by defendant Hobbs and Weaver what was happening at the situation. So was that enough for Officer Scott to have subjective knowledge that Mr. Boykin was having a medical emergency and to require Officer Scott to intervene and provide medical treatment? Yes, because again he was told that someone's reporting that they have the inability to breathe which is a serious medical emergency. Where's your case that supports that? So the line of cases that support that are one nearing Eastern and Williams that talk about turning a blind or deaf ear to an arrestee's request for medical attention saying that I cannot breathe. Right, but the arrestee didn't request that of Officer Scott. Another officer told him that. But it's still, even though that was secondhand relayed to him, it's still, he's still being informed someone is saying that they cannot breathe. That's still a serious medical issue that is life-threatening. Is there a question, what could Officer Weaver see as she was driving the vehicle to the jail? So could she see the rear compartment cam? Did she have visibility into that? So the, that's a, that is a subject of the genuine disputes of material facts in this case if she could see or not and what she could see. Where's the evidence that suggests she could see it? So the record of the pill at 1303, she looked into her rearview mirror 14 times and appears to be looking at Mr. Boykin. Then at the record of the pill at 1307, she turns around and looks at Mr. Boykin 14 times. But I'm asking about the rear compartment. The rear compartment camera angle shows him passed out. I mean, it's pretty clear. I mean, but, but where's the, where's the record evidence that she could see that as she was driving? So the record evidence is not talking about what she could see in the rear view compartment camera, Your Honor, I'm sorry. It is talking about the fact that even if she's saying she cannot see, she turned around and looked at him. And she also turned around and did that when he was not responding to her questions. Well, I'm just trying to get to the point of whether she could see this rear compartment camera. And the reason I'm asking that is that seems to be the clearest evidence there might've been an emergency. But if she couldn't see that, it couldn't flow into her subjective knowledge about his condition. Even if she, even if she could not see that, she still turned around to look at him. But so, but I'm asking though, is there evidence to create a fact dispute about that rear compartment camera that she may have seen it? No, Your Honor. You're saying that it's, it's undisputed. She did not see it as she was driving? Yes, but it's, it is disputed that she could still see him based on her turning around. The rear view mirror and all that. Yeah. And I want to be real clear. You are agreeing that it is undisputed that she could not see from that camera, that rear view camera. That's undisputed. She could not see from that what was going on that was being projected in that camera. Is that what you're saying? No, I'm saying that it is disputed that she could see based off of looking at a rear view camera, a rear view camera. Well, you're talking about the rear view mirror. Yeah. But wasn't there a camera who pointed towards the back seat? Yes. Yes. And I think that's the camera, I may be wrong, but I think that's the camera that Judge Wilson is asking you about. Yes. So my question is, does everyone agree she couldn't see any images from that camera or is that issue disputed? That issue is disputed. All right. Well, let me come back to all three of us hitting you with this. I apologize. Is there any evidence there was a monitor or something maybe on the dashboard or somewhere in the front? I mean, I don't know if the rear view camera is just for later reference or perhaps it's there so whoever's driving can see. I don't want you to say it's undisputed. You probably don't like that word. But is there any evidence to show that there was a way that she could have seen in real time what the camera was seeing? Is there any evidence? Forget about undisputed. Is there any evidence there's a monitor or something else that would have showed her what the camera was recording? No, your honor. Okay. And also I want to again refer the court back to the fact that even if she could not see out the rear view camera, she still turned around to look at him. Understood. And even if she could not see, she still could hear that he was becoming non-responsive in that she could hear that he was saying, I can't breathe. She could hear that he was saying that I can't pass out. So even if you take that she could not see out of the rear view camera, she still turned around, looked at him and she still could hear that he was becoming non-responsive and stopped responding to her questions and that he complained that I feel like I'm going to pass out and that he said that I cannot breathe during the course of the transport. But we also have audio from her that seems very clearly to indicate that she had no subjective knowledge that he was having a health emergency. Her tone, her questions, the banter back and forth before he lost consciousness. In other words, doesn't that doom your case or support summary judgment here because it sort of disproves any subjective knowledge? Her subjective state of mind is a question that should be left up to a jury. This court has said Well, but you've got to show subjective knowledge with evidence that she had knowledge, right? I mean, there's got to be some evidence. Right. And if the audio evidence of her questions and statements only suggest she doesn't have knowledge, where's the evidence that she did in fact have knowledge? Based off of her hearing that he was becoming non-responsive to her questions, based off of him saying that I have an inability to breathe, based off of him saying that I feel like I'm going to pass out, and that continuing in him deteriorating during the course of the transport. All our points point to her subjective knowledge. Her demeanor when she arrived at the jail when at the time now there's this manifest emergency that happened. It immediately changed. It immediately changed. I mean, she pulls in, she gets him out of the car, and at that point she actually starts doing the things you said she needed to do earlier, which is CPR and summoning medical authorities and that sort of thing. Right, but that is now a manifest emergency. Now he is completely unresponsive. But then she had knowledge. Before that she didn't have knowledge, and that would be required to sustain your claim. But she did have knowledge based off of turning around and seeing that he was becoming, he wasn't responding to her questions, hearing him responding to her questions. Those are all indications of subjective knowledge, and this court has said in Cope, Filder, and in Ford that subjective state of mind of the defendant should be left up to a jury to decide. These are all fact disputes that the jury should decide. Okay, based off of the things that I've already stated, her turning around, seeing him, him not responding, saying that he was going to pass out, saying that I have an inability to breathe. Those are all indications that there is a serious medical issue unfolding, and in that point in time when those things were happening, even before she gets to the jail, he becomes non-responsive, and she still does nothing when that happens. And this court has said in Thompson, in Dyer, in Allen, in Williams, that when there's a dire serious medical need, you don't wait until there's a manifest emergency that happens. You have to do something prior to that happening. So that is what is the clearly established law in this case, Your Honor. I see that my time has run out. Are there any other questions? Thank you. Okay, thank you. I guess we'll hear from your co-counsel in rebuttal. May it please the court. Counsel. Summary judgment should be affirmed because the defendants were not subjectively aware, and they did not infer, that Mr. Boykin faced a substantial risk of serious harm. All the defendants reasonably believed that Mr. Boykin was exhausted from a very lengthy foot on a very hot and humid day. The underlying medical condition, sickle cell trait, was not known to the defendants. The medical event that occurred, which is called ECAST, which is exercise collapse associated with sickle cell trait, is rare. And it is undisputed, and the plaintiff's medical retained expert and the defendant's medical retained expert agree that diagnosis of this ECAST event is extremely difficult for medical doctors, and that it's impossible for laypersons. Mr. Coleman, it doesn't mean diagnosing this rare event is not really what the issue is. The issue is whether the symptoms of this very rare event were serious enough, obvious enough, whatever else, to put one of these, some of these, all of these defendants on notice, and the symptoms you know better than I am. So you certainly are correct about the rarity of it, and I perhaps shouldn't cut you off, but it seems to me that's where we are. And why aren't these symptoms serious enough that either by looking in the mirror and seeing the deceased, not yet deceased, collapsed, or any of these other things, why isn't that sufficient at least to raise a fact question that at least some of these defendants would have known, even if they don't admit it? Yes, Your Honor. Let me respond this way. At the scene of the arrest, actually, the foot chase was actually a different set of police officers. It was the community college officers, and the Texarkana officers kind of backed them up. But at the scene of the arrest, there were six very well experienced and trained police officers. Also at the scene was a dean from the local community college. He was there and witnessed the arrest. All seven, excuse me, all six officers and the dean provided testimony in this case that they all believed that Mr. Boykin was simply suffering from exhaustion due to this physical event that had just occurred. In fact, the testimony before the trial court and on the record here is that one of the Texarkana college officers, Officer Altamirano, who was the female officer that pursued Mr. Boykin, a large portion of it, she was also experiencing exhaustion symptoms and was having difficulty breathing. So the officers, and let me add this, in the record there is evidence that exhaustion is a common event in police foot pursuits. There's a lot of excitement. There's a lot of adrenaline. It can go lengthy distances like in this case. So at the scene of the arrest, there was not one individual present that believed this was nothing more than exhaustion associated with this foot that Mr. Boykin did not request any type of medical assistance, did not ask for an ambulance, did not make that request. Well, he said he couldn't breathe. He did say he couldn't. And he said it repeatedly. He did. He said it several times. And then he was passed out in the car. And Your Honor, the evidence before the trial court was that Officer Weaver during that transport could not see Mr. Boykin in the back seat. Well, but she looked in the rearview mirror. She turned around a couple times. She's asking him questions and he's not responding at some point. At what stage does it become incumbent upon the officer to do more than just keep driving? In this case, I think it became, when she became subjectively aware that there was a serious medical risk that Mr. Boykin was suffering, that was when she opened the back door of the patrol car in the jail. During the transport. Well, she did that because she was at the jail. She did. She did. And when you're not suggesting that she only opened the door because she was not, she was being responsive to his medical. You're exactly right, Your Honor. The back door was open because they were parked and she was about to take her into the jail for processing. But immediately upon departing in the patrol vehicle from the scene, the video is very clear. Officer Weaver asked Mr. Boykin, do you want the window down? And she asked him, the air is on high, do you feel it? And he responded, yes. And then after he said, I think I'm going to pass out. She said, well, lean against the glass. And then she told him, they'll get you water at the jail. This is a very important fact. I want to go ahead and put it in the argument. Is that when she also says you're going to jail either way? I believe, I think she made a statement, something that not responding or whatever her response interpretation was, that he went silent and she believed he just wasn't talking. And that is what happens sometimes. Sometimes arrestees just don't want to talk. It's not an unusual event that certainly would put an officer on notice that there's a serious medical issue. She also told him they would get water at the jail. She knew, and this is not because she believed that there was a, that he was at risk for a serious medical need. But at that time in Bowie County, Texas, whenever an arrestee is brought to jail, the procedure in the jail at that point was to have a nurse assess every single arrestee that's being booked in, which is a little unusual. But at that time, that is what Bowie County did. So she knew that. But going on in the transport, she asked him questions about, you know, where are you staying at? What's your address? And then two minutes before they get to the jail, she states, are you comfortable? Are you getting air back there? And he does not respond. But these statements in the testimony from her and the video evidence clearly shows that she was not subjectively aware that Mr. Boykin was suffering a serious medical risk. And those statements and that evidence also shows that there was no deliberate indifference on her part. Going further, when Officer Weaver opens the back door of the patrol car, she says, okay, all right, we're here. I'm not picking you up. Come on, quit playing. Let's go, let's go. Again, these statements clearly reflect that she did not know that Mr. Boykin was suffering from a serious medical need. It wasn't until she performed the sternum rub, and at that point in time, it's very clear from the audio and video, she screams his name. She calls for an EMS. She calls for the jail nurse. She gets him out of the car. She unhandcuffs him. She begins CPR. This is very akin to... Does the evidence show whether or not he passed out before or after she went past the hospital? About the time on the camera, and let me back up, and Your Honor, I'll answer that question while it's on my mind. There is no monitor, and there's evidence in the record that Officer Weaver could not see what was being recorded on the backseat camera. She could not see that. Was something not operative, or is that all the camera's supposed to do is just record what happens back there? Sometimes people secrete evidence, put something out of their pocket, stick it in. So it's not meant to be a way to monitor what's going on in the backseat in real time? Not in that patrol car at that time. There are, I think in technology today, there are some cars that may have monitors for the backseat. That patrol car did not. That testimony and evidence is undisputed. But she had a rearview mirror in that car. She had a rearview mirror, and there was nothing obstructing her view of where the vehicle was inside the car. Now, to get back to answering your question, the summary judgment evidence that was before the trial court, I think is very important to answer your question, is this. Officer Weaver testified that she did not see Mr. Boykin's face during that transport in the backseat. She gave a statement that very night to the Texas Rangers. Her testimony on that point has been consistent from that night throughout her deposition and everything in this case. Now, this is important. In defense of the case, we retained an accident, I'm going to call it an accident reconstructionist, but a reconstructionist who, his name is Alex Germain, who recreated the interior of that squad car with 3D technology. And Officer Weaver sat in the car. They measured her. They measured her height of her eyesight, everything. Before the court is a video and a report from Mr. Germain. On the video, you can see when it's played. You can see when she looks to the rearview mirror. Now, remember, she's driving. She also has to look in her rearview mirror. That's part of normal driving. But she could not see Mr. Boykin in the backseat. And on that video, there's inlays of when she glances, you can see what she could see and what she could not see. And Mr. Germain opined that she could not see Mr. Boykin's face during that transport. That testimony went entirely unrebutted by the plaintiff. That includes whenever she turned around and tried to look in the backseat, not just the mirror, yes, it included that too. Yes, his report because he was slumped so far over against the correct door. Correct. And your honor, the additional evidence before the court was a report and testimony by Dr. Stacey Hale. She's a renowned emergency medicine specialist, and she testified among many things that, in her opinion, Mr. Boykin went extremist in the second half of the transport to the jail. And that is consistent with the video as well. But this is the reason why that fact is important. In the plaintiff's complaint, and there's an intervener, Mr. Boykin's father is the intervener. In his complaint and in the plaintiff's complaint, both state in their pleadings that the last half of the, or once they get past Wadley, that Officer Weaver could not see Mr. Boykin. So all of those facts came together. Mr. Jermaine, Dr. Hale, Officer Weaver, and the plaintiff's complaint. What do you mean the last half she could not see? That applies to the first half she could. That's in their complaint. Our position is, and the evidence that was presented to the court from the defendants, is that she could not see Mr. Boykin's face at all during the transport. Additional evidence before the trial court was the testimony of Dr. Francis O'Connor. He is the plaintiff's retained medical expert. And when he was deposed, he believed that the very first time that Officer Weaver became aware of a substantial serious medical need was at the jail. And what he testified to is he believed that Officer Weaver misconstrued the circumstances. And misconstruing the circumstances, Your Honor, is not deliberate indifference. He believed. Is that a professional opinion that he offered? That was his opinion, Dr. O'Connor. So he gets to opine about truth and falsity? Who's telling the truth or not? That's what he testified to, that he believed Officer Weaver had simply misconstrued the symptoms up until the time that she opened the back door. This was about a 10-minute drive? Eight minutes and 10 seconds. And what minute marker did he pass out? Approximately, when you look at the video, I don't have the times stamped in front of it, but I would represent to the court, it was approximately halfway, about the four-minute mark. And in Williams v. City of Yazoo, this Honorable Court stated, we have granted qualified immunity when law enforcement misconstrued- So what four minutes have been before she passed by the hospital? Approximately. It's about halfway. In fact, at the hospital on the video- So we do know? At the hospital- Yes, Your Honor. The dash cam, it appears to be the 1520-1522 second mark. So my point is, Dr. O'Connor recognizes what we believe is that simply Officer Weaver misconstrued the symptoms, and that is not- I guess my problem with hearing all that is, all that sounds to me like the kinds of things that juries resolve. Well, Your Honor- Who to believe and who not to believe. The testimony and the evidence I just related was unrebutted by the plaintiff. The testimony, or not testimony, but the argument that the plaintiff presented was a should-have-known type conjecture. It's not an actual knowledge of a substantial risk of harm. Mr. Coleman, let me ask you what a plaintiff must show as a tough test. There must be evidence in front of the law enforcement officer that would cause a person to believe that there's a serious medical need, and that conclusion must actually be drawn by the defendant. So how do you prove that without an admission? Surely, these cases can go forward without admissions from the law enforcement officer. Yeah, I know the four-minute person, four-minute mark. This person was seriously ill, but I didn't want to slow down. It seems to me that at times, the evidence is just clear enough that at best, the jury could say, surely the person drew that conclusion. Are you saying that's not enough? You can't make a jury question without an admission by the defendant? I don't believe so. In this case, the evidence that was presented by- I'm sorry? I'm not sure which way you- I don't believe so. I can best answer. The evidence in this case, it became a question of law. The district court was absolutely correct when it found that given the evidence presented, given the evidence that was unrebutted by the plaintiff, that a jury could not reasonably infer Officer Weaver was subjectively aware, given the totality of everything, all the evidence. It was unrebutted and could not be overcome. Your Honor, in the very last couple of minutes I have left, I want to address the second prong of qualified immunity, and that is whether the constitutional right at issue was clearly established at the time of this violation. And of course, just a month ago, our United States Supreme Court in the Zorn case reaffirmed what is clearly established law. But this circuit has long had a history that in order for law to be clearly established, there must be a robust consensus of persuasive authority that defines the contours of the right in question. It must be beyond debate. And the reason that's critical is because the clearly established law concept is essentially fair notice or fair warning to a reasonable peace officer so that these officers can be clear of what the confines, what is constitutional, what is unconstitutional. And this honorable court has said repeatedly that that burden is a heavy burden on the plaintiff. This case has a very unique twist with regard to the second prong, and that is this. In the plaintiff's original complaint, First Amendment complaint, Second Amendment complaint, throughout all the discovery, throughout all the expert depositions, the plaintiff's case was premised on that it was the duty of Officer Weaver to summon medical assistance when facing a serious medical need. That was the plaintiff's case. That was their entire case. This event occurred in August of 29. We filed the motion for summary judgment on behalf of our clients and pointed out to the trial court that Reed v. Nacogdoches in that case was decided in July of 2021, and that panel said this. It was not until July of 2021 that failing to call emergency assistance in the face of a known serious medical emergency violated the Constitution. So in August of 2019, the law was not clearly established on this point. It was still being debated, and there was not a robust consensus of authority. So when the parties appeared before the magistrate judge in this case to argue the summary judgment motion, the plaintiffs conceded that the law was not clearly established on this point. In August of 2019, they conceded that failing to summon medical assistance in that circumstance was not clearly established. So the magistrate judge then made inquiry, and this is all in the record, in the summary judgment hearing record before the court. The magistrate judge made inquiry, well, what is it if not calling medical assistance was not clearly defined, then what is it you're trying to say these officers were constitutionally required to do? And their response was they have to do something. And so my argument is this. Before the trial court, in the briefings of this case, here today, the plaintiff and the intervener has not identified what is that something, what is it that Officer Weaver was constitutionally required to do in this instance? And where is the clearly established law that supports that something? And, Your Honor, we believe that the plaintiffs have not met their burden in establishing clearly established law. In the last few seconds, I direct the court to the, let's see, it's the Batiste versus Thoreau case. That is a case in which this court, in a very similar circumstance, addressed this type of event. And the court found there that there was no clearly established law and qualified immunity was granted. All right, counsel. Thank you. You can please the court, counsel. The arguments just made are the arguments that should be made to a jury regarding the factual disputes in this case, what she did when she got to the jail, her beliefs. What happened in this case was the words were uttered by Mr. Boykin. I can't breathe. Please help me. I'm going to pass out. All right. But what is not a jury question is the clearly established law part, prong two. Where's your case that says when and how the officer is supposed to intervene medically? Well, I don't know if there is a case that explicitly states exactly how an officer is supposed to intervene medically. Well, what if she just hurried to get to the jail? It was an eight minute drive. She knew there was medical staff there. I think that would have been something great that she did not do. I mean, it's sort of a fortuity that we went by a hospital on this journey to the jail. But where's your case that says, no, the officer's got to apprehend this and divert to the hospital? Well, the case law states, and I know that Ms. Foss stated this earlier, but the case law states that they have to do something to provide medical care. And when you look at the case law, I think you could look at the Williams v. City of the Zoo case that Judge Graves, you were on. I know this post-dates the incident in this case, but I want to make sure that it's explicit. It cites to the Narin case, which was 1996. The Judge Graves, you said, or I don't know who wrote it, Procurium, but repeatedly held refusing to treat detainees or ignoring complaints is an unreasonable response to a known medical risk. In Thompson v. Upshore County, this court talked about a defendant who had stated that she just didn't believe the DTs were enough of a serious medical need. The court stated Wharton, who was the defendant there, may have subjectively intended harm, which would have been deliberate indifference, or negligently believed the DTs were not serious medical need. This is a quote, though. The issue of her state of mind is further trier of fact. That's also what we have in Ford v. Anderson County, where the court said that, even though jailers are saying they didn't hear the cries from the jail cell, saying they didn't see the vomit in the cell, they were walking the halls when the cries were being made. They went into the cell where the vomit was, so a jury could find that they did see this vomit and did hear these yells. When you have difference in opinion on what was known, what was not known, that's a trier of fact issue. I'm trying to get into the clearly established law of response for you, Judge Wilson. When we take this information, when we take Fielder v. Bussard, which says that faking it is simply not just a defense, you can say and get. In that case, the defendant said that they were faking, that they believed the jailee, the prisoner was faking, but that wasn't enough because that was a trier of fact issue. That was something that the court says they were leaving. But it seems to me that it's got to be beyond dispute, clearly established, that every reasonable officer would know to do something. So you've got to be able to show how it's clearly established, and I think you do have to articulate what the something is the officer's supposed to do. I think that it's clearly established. Where's the case? Well, I think that in Williams v. City of Yazoo, the court said that if any doubt remained about Williams' need for care at that point, it was eliminated when Williams told Dean and Banks that he could not breathe and asked them for medical assistance before they escorted him to his cell. I think it's common knowledge that if someone can't breathe, especially common knowledge for someone trained in basic medical care, such as the first responder or a police officer, if someone's saying they can't breathe, they are begging for help. Mr. Boykin literally said, I can't breathe multiple times and please help me. I don't know what else someone is supposed to say in that situation when they're saying I can't breathe, please help me, I'm going to pass out. What is the something the officer, Officer Weaver was supposed to do in the case that indicates it? Well, Your Honor, I do not have a case that tells you exactly what she was supposed to do, but I have ample case law that says she had to do something. She had to do something to provide medical care for his issue. Where's the case that says she has to interrupt the arrest in progress? She's transporting him to the jail, but you've got to divert to immediate medical attention as opposed to getting to the jail, etc. In a matter of four to six to eight minutes. I do not have a case that says those exact things, Your Honor. Then how is every reasonable officer supposed to know that what she did was violative of the Constitution and clearly established? Because the law in this circuit, in the Fifth Circuit, says that if you do nothing in response to knowing someone is in dire medical need... Isn't driving to the jail, continuing on to the jail to get him there, wouldn't that be doing something? I would disagree with that in a situation. She didn't show... She showed no urgency. Where's your case that says that? I don't have that case, Your Honor, but I think that if I can say that she had no urgency and showed no urgency in getting to the jail. She didn't speed up to get to the jail. She didn't radio ahead that we have someone who's going to need medical attention when they get there. I know that it was said that there was going to be a nurse at book-in. People sit in the jail at book-in for hours before they're booked in and see a nurse. So she didn't call ahead to say, hey, nurse, please come out to the garage. She didn't radio to the garage to say, we need an ambulance on the way. We need someone prepared to do something. She did absolutely... She didn't speed up. She didn't appear to do any sort of driving that showed that she was trying to get him there to get medical attention for him. She drove the exact same way she'd been driving while making the callous remarks, showing no regard for what was going on in the backseat of that car. And that, we believe, puts her on notice that she needed to provide medical care in some way. Whether speeding up, doing something, she did nothing. And that is clear in this court, in the Fifth Circuit, that it's deliberate indifference. All right. Can I just... Oh, I'm sorry. I've got just one question, if I may. And I may be misunderstanding this, but I know they say they have an expert who says that Officer Weaver couldn't see into the back of the car. Did you have an expert who said that she had a view of what was going on in the back? No, Your Honor. That was going to be challenged at trial and cross-examination, that he used her own measurements and her own testimony to him, saying, this is where I looked. You can see in the video, the video is what rebutts that. She turns and looks. You can see her even raise up. And when she's looking behind her, she's looking at different angles in the mirror. She's clearly looking at Mr. Boykin. All right. Thank you. Thank you.